## Thompson's Administrator v. Illinois Central Railroad Company, et al.

(Decided September 25, 1913).

### Appeal from Muhlenburg Circuit Court.

Railroads—Trespasser—Action for Damages—Evidence—Peremptory Instruction.—In an action by the administrator of a trespasser to recover damages for his death, based on the failure on the part of the engineer to use ordinary care to avoid injuring the decedent after his peril was discovered, evidence examined and held insufficient to take the case to the jury.

WALTER WILKINS for appellant.

TAYLOR & EAVES, TRABUE, DOOLAN & COX, BLEWETT LEE, C. L. SIVLEY and BROWDER & BROWDER for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Plaintiff, D. M. Thompson, as administrator of James Nelson Thompson, deceased, brought this action against the defendants, Illinois Central Railroad Company and its engineer, Sam Lawther, to recover for the

death of his intestate. At the conclusion of the evidence for plaintiff the court directed a verdict in favor of defendant. Judgment was entered accordingly, and plaintiff appeals.

The evidence for plaintiff is as follows:

Alfred Armstrong testified that he, Melvin Crumbaker and the decedent, James Nelson Thompson, all of whom lived in Central City, were walking along the defendant company's tracks between Milwood and Caneyville, in Grayson county, Kentucky. Growing tired, they sat down on the end of the railroad ties to rest. Thompson and Crumbaker sat down first, and soon went to sleep. There was a tie or two between them. Witness dropped his knife, and after looking for it he too sat down one or two ties above them. It was then about day-light on the morning of August 28, 1911. While they were asleep and sitting in a stooped position on the end of the ties close to the track, passenger train No. 132 came along and struck Thompson and Crumbaker. The first thing he knew he was upon the bank of a small cut near the railroad track. He was asleep when the train struck the other two boys, and did not see them at that time and did not know what position they were in. The train knocked the other two boys down the track some distance. The train ran past them and stopped with the baggage car near them.

George White, who lived about 30 steps from the railroad, testified that he was standing on his porch at the time the train passed. He heard the train whistle at his gate as if something was on the track, and saw the train stop. He went to where the boys were struck by the train. The train did not slacken its speed when it commenced whistling. The distance from the gate to the telephone pole where the train commenced whistling was, by actual measure, 158 1-3 yards, or 475 feet, from the place where the boys were struck. It was after daylight when the accident occurred, and the train was going up grade.

Mrs. George White, the wife of George White, testified that she saw the train before it struck the boys, and saw it stop. The bell was ringing and the whistle blowing so much that she knew there was trouble. The train continued to whistle from the time it began until it stopped.

Tom Stanfield, a brakeman, who had had twelve months' experience in running on the Illinois Central

Railroad and four years' experience on the Rock Island Railroad, but who had not been in the railroad business for about twelve years, testified that the grade at the point of the accident was, in his opinion, from 60 to 80 feet per mile. Upon being asked the schedule time of the train, he did not know, but upon having his memory refreshed, he supposed about 23 miles per hour. He did not measure the grade in any way. In answer to the question "In what distance could an engine hitched to this passenger train of three coaches, going up Millwood hill, a grade of sixty or seventy feet per mile, and running at the rate of twenty-three miles per hour, be stopped?" witness answered: "I suppose it could be stopped in 75 or 100 yards—I would think, going up that hill." Witness further stated that if the train was running at the rate of 45 miles per hour he supposed it would require a greater distance, but did not know exactly what distance would be required. Sam Lawther, the engineer in charge of the train on the day of the accident, testified that his train was running at the rate of 45 miles per hour, and that he blew the whistle of his engine when he first saw them. Tom Stanfield was then recalled by the plaintiff, and being asked in what distance could an engine pulling a baggage and two passenger coaches, running at the rate of 45 miles an hour, up a grade of 60 to 90 feet a mile, be stopped, answered: "That is pretty hard to say, what distance it could be stopped at that rate of speed up grade, but it looks like it could be stopped in 125 or 150 yards, up that grade." He further said that in case of an emergency it looked as if it could be stopped in three car lengths.

As the accident occurred out in the country, it is admitted that the decedent and his companions were trespassers, and the defendant owed decedent no duty except to use ordinary care to avoid injuring him after his peril was discovered. Plaintiff's case, therefore, depends upon whether or not there was sufficient evidence on this point to take the case to the jury.

It is earnestly argued that as the proof shows the engineer began to give the alarm signals when he saw the boys, and furthermore that it was possible to stop the train in from 75 to 100 yards if going at a speed of 23 miles an hour, and from 125 to 150 yards if going at 45 miles an hour, there is sufficient evidence to take the case to the jury. There is practically no evidence, how-

ever, to the effect that the train was running at the rate of 23 miles an hour. The only evidence to that effect was the statement of the witness Stanfield that he supposed that was the schedule time, after counsel for the plaintiff asked him the question which suggested the answer expected.

Furthermore, the schedule time of a train is the regular time, including the time consumed in stopping at stations. Therefore, the schedule time of the train is by no means conclusive of its actual time. The actual time is generally somewhat in excess, and frequently far in excess, of the schedule time. In this case the only direct evidence of the actual speed of the train is the statement of the engineer that it was going at the rate of 45 miles an hour. While the boy who was not injured says that the intestate and the other boy went to sleep in a stooping position, there is no evidence tending to show their position at the time that the train actually struck them. The engineer says that when he saw them he immediately sounded the alarm. The train was moving very rapidly. The boys were only about 158 yards distant. The act of ringing the bell and blowing the whistle necessarily consumed some time. Furthermore, the law did not require the engineer to apply his brakes until he had given the alarm, and it was then reasonably apparent to a person of ordinary prudence, situated as he was, that the boys were unconscious of the approach of the train. As a matter of fact, the train did stop with the baggage car near the boys. Giving full effect to the evidence for plaintiff, though it bears the ear-marks of speculation rather than of sound judgment, it merely tends to prove that the train could have been stopped between the point at which the engineer saw the boys, and the point at which the accident occurred. It does not show that after the lapse of time necessarily consumed in giving the alarm signal, and after it became reasonably apparent to a person of ordinary prudence, situated as the engineer was, that the boys were unconscious of the approach of the train, he could, in the exercise of ordinary care, with the means at his command, have stopped the train in time to avoid injuring the intestate. Reynolds' Admr. v. C., N. O. & T. P. Ry. Co., 148 Ky., 252; Creager's Admr. v. I. C. R. R. Co., 134 Ky., 543. It follows that the peremptory instruction was properly given.

Judgment affirmed.